1 | BENJAMIN B. WAGNER                                            (5/29/2013)
   | United States Attorney
2 | Richard J. Bender
   | Assistant U.S. Attorney
3 | 501 I Street, Suite 10-100
   | Sacramento, California 95814
4 | Telephone: (916) 554-2731                              MAY 3 1 2013





5 |                                         CLERK, U.S. DISTRICT COURT
   |                                         EASTERN DISTRICT OF CALIFORNIA
6 |                                         BY _____
   |                                                 DEPUTY CLERK
7 |
   |            IN THE UNITED STATES DISTRICT COURT
8 |
   |         FOR THE EASTERN DISTRICT OF CALIFORNIA
9 |
10 |
   | UNITED STATES OF AMERICA,        )  CASE NO.  2:12-CR-0255 GEB
11 |                                   )
   |                     Plaintiff,    )  **PLEA AGREEMENT**
12 |                                   )
   | v.                                )
13 |                                   )
   | MATTHEW ROWAN DAVIES,             )
14 |                                   )
   |                     Defendant.    )
15 |                                   )
   |                                   )
16 |                                   )
   |                                   )
17 | _____ )
18 |
   |                              I.
19 |
   |                      **INTRODUCTION**
20 |
   |      **A.   Scope of Agreement:**  The Second Superseding Information
21 |
   | (hereinafter "Information") in this case charges the defendant with
22 |
   | one count of conspiracy to manufacture, distribute, and possess with
23 |
   | the intent to distribute marijuana in violation of 21 U.S.C. §§ 846,
24 |
   | 841(a)(1), two counts of the manufacture of marijuana in violation of
25 |
   | 21 U.S.C. § 841(a)(1), and seven counts of distribution of marijuana,
26 |
   | in violation of 21 U.S.C. § 841(a)(1).  This document contains the
27 |
   | complete plea agreement between the United States Attorney's Office
28 |

                                    1

1 for the Eastern District of California (the "government") and the
2 defendant regarding this case. This plea agreement is limited to the
3 United States Attorney's Office for the Eastern District of
4 California and cannot bind any other federal, state, or local
5 prosecuting, administrative, or regulatory authorities.

6     **B. Rule 11(c)(1)(C) Specific Sentence Agreement:** The
7 government and the defendant agree that the defendant should be
8 sentenced to a prison term of 5 years. Consequently, this Plea
9 Agreement is being offered to the Court pursuant to Rule 11(c)(1)(C)
10 of the Federal Rules of Criminal Procedure. Under the provisions of
11 Rule 11(c)(3), the Court may accept or reject the agreement, or may
12 defer its decision as to the acceptance or rejection until there has
13 been an opportunity to consider the presentence report. If the Court
14 accepts the Plea Agreement, the Court will inform the defendant that
15 it will not impose a sentence that exceeds 5 years. If the Court
16 rejects this Plea Agreement, the Court shall so advise the defendant,
17 allow the defendant the opportunity to withdraw his plea, and advise
18 him that if he persists in a guilty plea the disposition of the case
19 may exceed five years in prison up to the available statutory
20 maximums. Should the defendant actually withdraw his guilty plea,
21 then this agreement shall be null and void and the parties may take
22 whatever position they deem appropriate as to all issues going
23 forward.

24                                                                     **II.**

25                             **DEFENDANT'S OBLIGATIONS**

26     A. **Guilty Plea:** The defendant agrees to waive his right to be
27 charged via Grand Jury Indictment and to plead guilty to all ten
28 counts contained in the Information. The defendant agrees that he is

2

1 in fact guilty of these charges and that the facts set forth in the
2 Factual Basis For Plea attached hereto as Exhibit A are accurate.

3  **B.  Sentence Recommendation:** The defendant and his attorney will
4 recommend that the defendant be sentenced to 5 years in prison.  The
5 defense is free to recommend whatever it deems appropriate as to all
6 other aspects of sentencing (e.g., fine, conditions of supervised
7 release, etc.).

8  **C.  Special Assessment:**  The defendant agrees to pay a special
9 assessment of $ 100 per count for a total of $1,000, due at the time
10 of sentencing by delivering a check or money order payable to the
11 United States District Court to the United States Probation Office
12 immediately before the sentencing hearing.  The defendant understands
13 that this plea agreement is voidable by the government if he fails to
14 pay the assessment prior to that hearing.

15  **D.  Financial Disclosure:** The defendant agrees to make a full
16 and complete disclosure of his assets and financial condition, and
17 will complete the United States Attorney's Office's "Authorization to
18 Release Information" and "Financial Affidavit" within five (5) weeks
19 from the entry of the defendant's change of plea.  The defendant also
20 agrees to have the Court enter an order to that effect.  The
21 defendant understands that the failure to complete and submit the
22 financial information form will be considered by the Court in
23 determining the appropriate fine, if any, to assess in this case.
24 Further, this plea agreement is voidable at the option of the
25 government if the defendant fails to complete truthfully and provide
26 the described documentation to the United States Attorney's office
27 within the allotted time.
28 //

3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**III.**

**THE GOVERNMENT'S OBLIGATIONS**

**A.  Agreement to Forego Other Charges:** As part of this agreement, the government will forego charging certain greater drug amounts levels in the charged drug offenses, which contain longer mandatory minimum and longer statutory maximum prison terms.  The government also agrees to forego certain money laundering charges that could be brought.

**B.  Dismissals:**  The government agrees to move, at the time of sentencing, to dismiss without prejudice the underlying Indictment. The Government also agrees not to reinstate any dismissed count except as provided in paragraphs II(C) and VII(B) of this Agreement.

**C.  Recommendations:**

**1.  Incarceration Range:**  The government will recommend that the defendant be sentenced to five years in prison.  The government may recommend whatever it deems appropriate as to all other aspects of sentencing (e.g., fine, terms of supervised release, etc.).  The government also agrees to recommend that the Sentencing in this case be held on or after September 27, 2013, to allow the defendant sufficient time to get his business affairs in order.

**2.  Free to Argue all Facts:** The government is free to provide full and accurate information to the Court and Probation, including answering any inquiries made by the Court and/or Probation and rebutting any inaccurate statements or arguments by the defendant, his attorney, Probation, or the Court. It is specifically understood that the government is free to make any and all arguments and to present any factual information about the case and information concerning the defendant to the Probation Officer and the Court for

4

1  the purposes of determining whether a fine is appropriate and the
2  amount of any such fine.  The government is free to defend on appeal
3  or collateral review any sentence that the Court may impose (e.g.,
4  should the Court advise that it intends to impose a sentence
5  exceeding five years and the defendant elects not to withdraw his
6  guilty plea).

7        **2.  Credit toward fine**: The government agrees to recommend
8  that the Court reduce the amount of any fine it intends to impose by
9  $100,000, which is the amount of funds seized from the Freeman law
10 firm, which funds have been administratively forfeited, and which
11 seizure the defense was instrumental in securing.

12                                   **IV.**

13                       **ELEMENTS OF THE OFFENSE**

14      **A.  Elements of the Offense:**  At a trial, the government would
15 have to prove beyond a reasonable doubt the following elements of the
16 following offenses to which the defendant is pleading guilty:

17      As to Count 1, Conspiracy to manufacture, distribute, and
18 possess with the intent to distribute marijuana, in violation of 21
19 U.S.C. § 846 and 841(a)(1), the government would have to prove:

20      (1) that beginning on or about September of 2009, and ending on
21 or about ~~March 30, 2012~~ *November 6, 2011 PEH* there was an agreement between two or more
22 persons to grow and/or distribute marijuana, and

23      (2) the defendant became a member of the conspiracy knowing of
24 at least one of its objects and intending to help accomplish it.

25      Once a person has become a member of the conspiracy, that person
26 is responsible for the actions of the other conspirators performed
27 during the course and in furtherance of the conspiracy.  If one
28 member of the conspiracy commits a crime in furtherance of a

                                   5

1 conspiracy, the other members have also, under the law, committed the
2 crime.

3    As to Counts 2 and 3, which charge the manufacture of marijuana
4 in violation of 21 U.S.C. § 841(a)(1), the government would have to
5 prove:

6    (1) That the defendant grew, directed or otherwise knowingly
7 aided and abetted the growing of marijuana at the charged location,
8 and

9    (2) That the defendant knew that what was being grown was
10    marijuana.

11 As to Count 2 the government would also have to prove that at least
12 100 marijuana plants were grown. As to Count 3, the government would
13 have to prove that at least 50 plants were grown.

14    As to Counts 4 through 10, which charge the distribution of
15 marijuana in violation of 21 U.S.C. § 841(a)(1), the government would
16 have to prove;

17    (1) That defendant knowingly delivered, or aided, abetted,
18 counseled, or directed the delivery of marijuana to another person,
19 at the charged location,

20    (2) The defendant knew that it was marijuana that was
21 distributed.

22 As to Count 5, the government would also have to prove that at least
23 100 kilograms of marijuana were distributed. As to Counts 4 and 6,
24 the government would also have to prove that at least 50 kilograms of
25 marijuana were distributed. As to Counts 7, 8, 9, and 10, the
26 government would have to prove that more than a small amount of
27 marijuana was distributed for remuneration.

28 //

6

**V.**

**MAXIMUM SENTENCE**

**A. Maximum Penalty:** The maximum sentence that the Court can impose on each of Counts 1, 2, and 5 is 40 years of incarceration and the minimum sentence that can be imposed is 5 years in prison. A term of supervised release of between four years to life and a fine of up to $5,000,000 per count could be imposed.

The maximum sentence that the Court can impose as to each of Counts 3, 4 and 6 is 20 years, a fine of up to $1,000,000, and a term of supervised release of from 3 years to life.

The maximum sentence that the Court can impose as to each of Counts 7, 8, 9, and 10 is 5 years in prison, a fine of not more than $1,000,000, and a term of supervised release of from 2 years to life.

A statutory assessment of $100 will also be imposed as to each count for a total of $1,000.

The sentences on each of these counts can be run concurrent (i.e., at the same time) or consecutive (i.e., one after the other separately). In addition, the defendant may be ineligible for certain federal and/or state assistance and/or benefits, pursuant to 21 U.S.C. § 862.

**B. Violations of Supervised Release:** The defendant understands that if he violates a condition of supervised release at any time during the term of supervised release, the Court may revoke the term of supervised release and require the defendant to serve up to 3 additional years imprisonment.

//

//

//

7

1 | **VI.**

2 | **SENTENCING DETERMINATION**

3 **A.** **Statutory Authority:** The defendant understands that the
4 Court must consult the Federal Sentencing Guidelines (as promulgated
5 by the Sentencing Commission pursuant to the Sentencing Reform Act of
6 1984, 18 U.S.C. §§ 3551-3742 and 28 U.S.C. §§ 991-998, and as
7 modified by United States v. Booker and United States v. Fanfan,
8 543 U.S. 220 (VI), 125 S.Ct. 738 (2005)) and must take them into
9 account when determining a final sentence.  The defendant understands
10 that the Court will determine a non-binding and advisory guideline
11 sentencing range for this case pursuant to the Sentencing Guidelines.
12 The defendant further understands that the Court will consider
13 whether there is a basis for departure from the guideline sentencing
14 range (either above or below the guideline sentencing range) because
15 there exists an aggravating or mitigating circumstance of a kind, or
16 to a degree, not adequately taken into consideration by the
17 Sentencing Commission in formulating the Guidelines.  The defendant
18 further understands that the Court, after consultation and
19 consideration of the Sentencing Guidelines, must impose a sentence
20 that is reasonable in light of the factors set forth in 18 U.S.C.
21 § 3553(a).

22 **B.** **Guidelines Stipulations:** The government and the defendant
23 agree that the following is their calculation of the applicable
24 sentencing guideline variables.  These calculations shall not be
25 binding on the Court or the Probation Office.

26 **1.** **Base Offense Level: 28** (435 kilograms of marijuana
27 produced),

28 **2.** **Role in the Offense Adjustment: +4** (manager or

8

1    supervisor of activity involving 5 or more persons),

2        **3.   Maintaining a Place: +2** [USSG § 2D1.1(b)(12) - Paid

3    rent on Vicki Lane warehouse and Autumn Chase residence, and

4    controlled MediZen dispensary]

5        **4.   Acceptance of Responsibility:** -3

6        **5.   Criminal History:** no criminal record (Category I)

7        **6.   Sentencing Range: 31/I = 108-135 months**

8        **7.   Fine Range: $15,000 to $5,000,000.**

9        **Departure:** Both parties agree that a downward departure as to
10   the amount of incarceration to be imposed is appropriate based on
11   involvement in a marijuana distribution activity for which various
12   business licenses were obtained for the dispensaries from local
13   government entities, and where the dispensaries reported and paid
14   state sales taxes on the activity. See, U.S.S.G. § 5K2.0(a)(1)(A)
15   (departures based on ground not adequately considered by the
16   Sentencing Guidelines).

17       Both parties are free to argue § 3553(a) factors as they deem
18   appropriate within the confines of this agreement.

19                                    **VII.**

20                                   **WAIVERS**

21       **A.   Waiver of Constitutional Rights:**  The defendant understands
22   that by pleading guilty he is waiving the following constitutional
23   rights:  (a) to plead not guilty and to persist in that plea if
24   already made; (b) to be tried by a jury; (c) to be assisted at trial
25   by an attorney, who would be appointed if necessary; (d) to subpoena
26   witnesses to testify on his behalf; (e) to confront and cross-examine
27   witnesses against him; and (f) not to be compelled to incriminate
28   himself.

                                        9

1    **B.  Waiver of Appeal and Collateral Attack:**  The defendant
2  understands that the law gives him a right to appeal his conviction
3  and sentence.  He agrees as part of his plea, however, to give up the
4  right to appeal the conviction and the right to appeal any aspect of
5  the sentence imposed in this case so long as his prison sentence is
6  no longer than 5 years.

7       Regardless of the sentence he receives, the defendant also gives
8  up any right he may have to bring a post-appeal attack on his
9  conviction or his sentence.  He specifically agrees not to file a
10  motion under 28 U.S.C. § 2255 or § 2241 attacking his conviction or
11  sentence.

12                              **VIII.**

13                      **ENTIRE PLEA AGREEMENT**

14       Other than this plea agreement, no agreement, understanding,
15  promise, or condition between the government and the defendant
16  exists, nor will such agreement, understanding, promise, or condition
17  exist unless it is committed to writing and signed by the defendant,
18  counsel for the defendant, and counsel for the United States.

19                               **IX.**

20                    **APPROVALS AND SIGNATURES**

21    **A.  Defense Counsel:**  I have read this plea agreement and have
22  discussed it fully with my client.  I have worked with and consulted
23  with cocounsel, Elliot Peters, in negotiating the plea agreement with
24  the government.  The plea agreement accurately and completely sets
25  forth the entirety of the agreement.  I concur in my client's
26  decision to plead guilty as set forth in this plea agreement.

27

28  DATED:  _5/31/2013_                    _____
                                          PATRICK K. HANLY
                                          Counsel for Defendant

                                10

1    **B.  Defendant:**  I have read this plea agreement including the
2  factual statements contained in Attachment A, and carefully reviewed
3  every part of it with my attorneys Patrick K. Hanly and/or Elliot
4  Peters, as needed.  I understand it, and I voluntarily agree to it.
5  Further, I have consulted with my attorneys and fully understand my
6  rights with respect to the provisions of the Sentencing Guidelines
7  that may apply to my case.  No other promises or inducements have
8  been made to me, other than those contained in this plea agreement.
9  In addition, no one has threatened or forced me in any way to enter
10 into this plea agreement.  Finally, I am satisfied with the
11 representation of my attorneys in this case.

12

13 DATED:  _5/31/13_        _____
                                    MATTHEW R. DAVIES, Defendant
14

15   **C.  Attorney for United States:**  I accept and agree to this plea
16 agreement on behalf of the government.

17

18 DATED:  _5/31/2013_        BENJAMIN B. WAGNER
                                    United States Attorney
19

20                                By: _____
21                                    RICHARD J. BENDER
                                      Assistant U.S. Attorney
22

23

24

25

26

27

28

                                    11

1                            **EXHIBIT "A"**

2                     **Factual Basis for Plea**

3     Law enforcement became focused on the Matthew Davies and Lynn

4 Smith marijuana growing and distribution operations on October 4,

5 2011.  On that date Stockton Police Officers responded to a burglary

6 call at a single story concrete warehouse located at 1838 Vicki Lane

7 in Stockton.  Fourteen persons were found working at the marijuana

8 growing facility.  Upon contacting the building's owner, he

9 identified codefendant Smith as the lessee on the building and

10 defendant Davies as Smith's broker on the transaction.

11 Approximately two weeks later, federal search warrants were executed

12 at the residences of defendants Smith and Davies, at the marijuana

13 dispensary locations of Central Valley Caregivers Cooperative (CVC),

14 MediZen, and at the Offices of SJC Consulting (a marijuana

15 management company owned/operated by codefendant Davies and

16 defendant Smith) and its accountant.  The investigation went forward

17 from there and determined the following.

18 **A.  Pathways Dispensary (Count Four):**

19     During the fall of 2009, Defendant Matthew Davies and

20 codefendant Lynn Smith opened a marijuana dispensary named Pathways

21 Family Health Cooperative ("Pathways") on East Acacia Street in

22 Stockton.  Defendant Davies provided the start up funds to open the

23 business and maintained a management/ownership role throughout its

24 existence.  Pathways operated as a marijuana dispensary from

25 approximately November of 2009 until early June of 2010, when it was

26 closed down by the City of Stockton.  A profit and loss statement

27 obtained during the investigation showed that between October of

28 2009 and September of 2010, Pathways had $2,231,468 in sales of



1  marijuana products, allocated $1,223,795 for the cost of the
2  marijuana it sold and showed a net loss of $54,868 after all
3  expenses. During its operation the exact amount of marijuana sold
4  is unknown but it exceeded 50 kilograms.

5  **B. CVC Dispensary(Count Five):**

6      In August of 2010, defendant Davies and codefendant Smith
7  opened a new marijuana dispensary, just outside the city limits of
8  Stockton, named Central Valley Caregivers Cooperative ("CVC") at
9  3260 Tomahawk Drive. Although they were partners in the business,
10 Codefendant Smith managed the day-to-day operation of the business.
11 CVC was a lucrative operation and averaged over $300,000 a month in
12 gross sales through most of its existence. The dispensary operated
13 for fourteen months before closing in October of 2011. A profit &
14 loss statement obtained during the investigation shows that between
15 the year 2011, it had over $4,500,000 in gross sales. Depending on
16 the expenses allowed, CVC showed a net profit of at least $294,000
17 (a figure that includes the payment of $400,000 of expenses of the
18 other dispensaries). During its operation, the exact amount of
19 marijuana sold is unknown but it exceeded 100 kilograms.

20 **C. Autumn Chase Marijuana Grow (Count Three):**

21     Sometime towards the end of 2009, defendant Davies and
22 codefendant Smith directed the growing of marijuana for the purpose
23 of supplying their Pathways dispensary. To gain experience in
24 growing marijuana, they recruited codefendant Robert Duncan to
25 operate a smaller scale indoor marijuana grow in the garage of a
26 residence located at 3115 Auburn Chase Circle in Stockton. The
27 growing of marijuana continued for approximately one year. Four
28 grow cycles were completed at that location. Seized bank account
   records show that Smith and Davies both paid the lease rent on the



1  residence at different times in 2010. Robert Duncan was paid a
2  salary for growing the marijuana and was supervised by Davies and
3  Smith.  Seized email communications between defendant Davies and
4  codefendants Duncan and Smith show extensive discussions between
5  them about the setting up, cultivation, and harvesting of marijuana
6  at that location. A total of four grow cycles were completed at
7  that location.

8  **D. Vicki Lane Warehouse (Count Two) and Tomahawk Warehouse:**

9  In approximately July of 2010, defendant Davies, along with
10  codefendants Smith and Duncan, starting growing marijuana on a
11  larger scale in a warehouse located at 1838 Vicki Lane in Stockton.
12  Inside the large warehouse, multiple smaller structures were built
13  in which the marijuana was actually grown (starting with 3 of these
14  smaller structures, but increasing as they went along until a total
15  of nine were in place by the summer of 2011). Codefendant Duncan
16  was put in charge of this warehouse growing operation and reported
17  to defendant Davies and codefendant Smith.  The warehouse produced
18  four completed crops prior to October 4, 2011 and produced about 25
19  to 30 pounds of finished product per room on average.  The finished
20  marijuana product grown at the warehouse during 2010 and 2011 was
21  sold at CVC, MediZen and other dispensaries owned/operated by
22  defendant Davies and codefendant Smith.  Defendant Davies also sold
23  marijuana from their grow locations to Bay Area marijuana
24  dispensaries.

25  In approximately October of 2010, Davies and Smith started a
26  second smaller marijuana grow warehouse located in the same
27  warehouse complex as the CVC dispensary on Tomahawk Street in
28  Stockton.  They provided the start-up funds and directed the



A-3

1   activity in the warehouse. This second warehouse contained three
2   grow rooms. It produced about 25 pounds of finished product per
3   room per harvest. Two harvests had been completed and the third was
4   in the process of completion before it was closed down in October of
5   2011.

6   **E.  MediZen dispensary (Count Six):**

7        In February of 2011, Davies and Smith, using funds from CVC,
8   purchased a marijuana dispensary in Sacramento located at 2201
9   Northgate Blvd., Suite H, named Cherry Orchard LLC, dba East Bay
10  Health Solutions. This dispensary was qualified to apply for one of
11  the City of Sacramento issued permits for operating a marijuana
12  dispensary, which position was a valuable commodity because only
13  dispensaries that existed before a certain date were allowed to
14  apply for those permits. Davies and Smith paid the two prior owners
15  of that facility approximately $100,000 in cash and assumed the
16  liability on past due taxes (approximately $80,000) and past due
17  wages to employees of the facility. Davies and Smith renovated the
18  facility and changed its name to "MediZen." They controlled the
19  dispensary's operation and finances. Profit & Loss Statements of
20  Cherry Orchard LLC and MediZen obtained during the investigation
21  showed that during 2011 (after dispensary had been purchased by
22  Davies and Smith), the dispensary had $2,000,000 in gross sales of
23  marijuana products and a net loss of about $50,000. Over 50
24  kilograms of marijuana were sold by this dispensary during its
25  period of operation.

26  **F.  R & R Wellness dispensary (Count Ten):**

27       In July of 2011, Davies and Smith also took over the management
28  and operation of R & R Wellness Collective, a marijuana dispensary

                                 A-4

1  located at 75 Quinta Court, Sacramento, and renamed it Sacramento
2  Patients Group (SPG). The prior owner of R & R Wellness had been
3  recently arrested on California marijuana cultivation and sales
4  charges involving that same dispensary, and the facility had
5  recently been the subject of a state search warrant. From July
6  until September of 2011, Davies and Smith operated SPG, selling
7  marijuana from their grow warehouses, provided the employees to run
8  the dispensary, and provided their computer system for sales and
9  inventory control.

10  **G.  Port City Health & Wellness dispensary (Count Nine):**

11  During July of 2011, defendant Davies purchased a controlling
12  interest in Port City Health and Wellness Cooperative ("Port City"),
13  one of the three applicants who had obtained a license from the City
14  of Stockton to open a marijuana dispensary within the Stockton City
15  limits. Davies paid $100,000 cash and three $25,000 cashiers checks
16  to the then existing business partners of Port City. He also loaned
17  Port City $30,000 (cash). Davies had management control over the
18  business and used his trusted personnel to get the business up and
19  running. The facility opened for a few weeks in September/October
20  of 2011, before it was closed by the partners because of the
21  increase in federal law enforcement activity involving marijuana
22  dispensaries.

23  **H.  River City Wellness dispensary (Count Eight):**

24  During August and September of 2011, defendant Davies and
25  codefendant Smith managed and operated another marijuana dispensary
26  called River City Wellness Collective, located at 3830 Northgate
27  Blvd., in Sacramento. Although River City Wellness was owned by
28  another person, Davies and Smith operated the facility for about a

A-5

$\mathcal{N}$

1  two month period. They supplied the marijuana (from their
2  warehouses) that was sold by the dispensary during that time period
3  and used their employees and computer systems to manage the
4  operation of the business.

5  **I.  Twelve-Hour Care dispensary (Count 7):**

6      In approximately September of 2011, defendant Davies and
7  codefendant Smith purchased Twelve-Hour Care ("THC"), another
8  permitted marijuana dispensary in Sacramento located at 6820
9  Fruitridge Road. It was managed by the defendant Davies and
10  codefendant Smith for a short period of time before it was closed
11  in October of 2011 due to increased federal law enforcement
12  activity. Defendant Davies turned the business over to one of his
13  employees who opened it back up and operated it from December of
14  2011 until March of 2012 when it shut down afer a federal search
15  warrant was executed on the premises.

16  **J.  Quick & Easy Cooperative Market, Inc.:**

17      During 2010, defendant Davies and codefendant Smith opened and
18  operated a marijuana dispensary in Manteca for a brief period of
19  time (a few days), before it was shut down by the City of Manteca.

20

21

22

23

24

25

26

27

28